IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA    )
                            )
    v.                      )         1:11CR160-1
                            )
TEODORO ROSAS-HERRERA       )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

Before the court is the motion to suppress filed by Defendant Teodoro Rosas-Herrera ("Rosas-Herrera"), who is charged here in a single-count indictment for illegal reentry of a removed alien in violation of 8 U.S.C. § 1326(a) and (b)(2). Rosas-Herrera contends that his arrest was unlawful and seeks to suppress all information law enforcement collected following his arrest that revealed his true identity. The Government opposes the motion. An evidentiary hearing was held October 4, 2011. For the reasons set forth below, the motion will be denied.

I.  BACKGROUND

The Government presented the testimony of three witnesses. James Carter ("Detective Carter") is a Detective with the Alamance County (North Carolina) Sheriff's Office ("ACSO"), with 16 years of law enforcement experience. Jeff Randleman ("Deputy Randleman") has been employed as an ACSO Deputy Sheriff for 22 years. Edmund Thomas ("Agent Thomas") is employed as an agent

with the United States Immigration and Customs Enforcement agency ("ICE") of the Department of Homeland Security in Charlotte, North Carolina. The court finds the testimony of each of these three witnesses to be credible and finds the following facts.

On February 6, 2011, Detective Carter was on duty driving his patrol car on Durham Street in Alamance County when he noticed a vehicle with its front windshield "completely iced over" except for a small 3" x 4" hole approaching at approximately 10 m.p.h. in the opposite lane. Detective Carter could not see inside the vehicle and thus could not determine the sex, ethnicity, or race of the driver. After the vehicle passed, Detective Carter turned his patrol vehicle around but found that the suspect vehicle had already turned left off the roadway into a driveway, where it had pulled up to a closed gate. Detective Carter pulled up behind the vehicle and, at least in part because he was unable to exit his vehicle from the roadway completely, activated his blue lights.

Detective Carter approached the stopped vehicle and asked the driver for his driver's license and registration. The driver did not have either but indicated that he had a Mexican driver's license, identified himself as Carlos Matias Ortiz ("Ortiz"), and provided a date of birth. Detective Carter returned to his patrol vehicle to run a check on the name and

2

date of birth he had been given. As he was doing so, he observed Ortiz open his vehicle door and exit the vehicle. Detective Carter advised Ortiz to stay in the vehicle, but Ortiz fled. Detective Carter called for backup and chased Ortiz across the roadway, through a field, and into the woods nearly one-half mile for about 8 to 10 minutes. Ortiz eventually stumbled and fell, and Detective Carter secured and arrested him for resisting a public officer.

By the time Detective Carter returned to his patrol car with Ortiz, two other officers had arrived on the scene with a drug-sniffing canine. Ortiz was placed in a patrol vehicle. One of the officers walked the canine around Ortiz's vehicle, and the canine alerted on the driver's side where the driver's door had remained open since Ortiz fled from the vehicle. In examining where the canine had alerted, Detective Carter observed a firearm "sticking under the seat."

Detective Carter took Ortiz to the Alamance County jail, where he was presented to a magistrate. Ortiz again gave his name as Carlos Matias Ortiz. His Conditions of Release and Release Order notes that he was charged with the offenses of "resisting public officer" and "carrying a concealed weapon" and

3

was released on a $5,000 secured bond.[1]  (Gov't Ex. 1.)  Up to this point in time, Detective Carter stated, he had no reason to believe the Defendant's name was anything other than Ortiz.

Shortly thereafter, Deputy Randleman, who is assigned to the ASCO's "287G unit" charged with interviewing and processing non-US born defendants, was advised that Ortiz had stated he was foreign born and would need to be processed.[2]  Consequently, Deputy Randleman interviewed Ortiz to complete an "ICE Interview" form based on Ortiz's responses.  (Gov't Ex. 2.)  In the interview, Ortiz first stated that his name was "Carlos Matias Ortiz."  But when Ortiz's fingerprints were taken as part of the booking process, the fingerprinting equipment automatically matched them to fingerprints for "Theodoro Rosas-Herrera."  (Gov't Ex. 7.)  Ortiz admitted that while he had also used the name Carlos Matias Ortiz, his real name was Teodoro Rosas-Herrera.  This process was completed by 10:18 a.m.  Deputy Randleman also learned that Rosas-Herrera had previously been deported from the United States and provided him his consular notification (informing Rosas-Herrera of his right to have his country's local consulate notified of his detention and the

---

[1] The Government states in its brief that the Defendant was also charged with failure to have a North Carolina operator's license, but no evidence of that was presented at the hearing.

[2] Deputy Randleman acknowledged that a defendant's mere foreign nationality does not always mean that he or she is present in the United States illegally.

basis for his arrest). (Gov't Ex. 3.) According to Deputy Randleman, by this point the process was purely "routine administrative booking" and "biographical" in nature. According to Deputy Randleman, every defendant brought to the Alamance County jail who reports that he or she is foreign born is subjected to this same process.

Later that afternoon, at approximately 2:00 p.m., Deputy Randleman served Rosas-Herrera with his notification of rights, notifying Rosas-Herrera that procedures would be in place to reinstate a prior order of removal to deport him. (Gov't Ex. 4.) He was also advised of his rights under Miranda.[3] (Gov't Ex. 5.) Thereafter, Rosas-Herrera refused to provide any additional information. (Gov't Ex. 6.)

Finally, Agent Thomas, whose duties include conducting prosecutions and deportations for ICE, identified Rosas-Herrara's "A-file", which is a record of an individual's interactions with ICE. (Gov't Ex. 8.) Rosas-Herrera's A-file indicates that he was deported and removed from the United States on November 17, 2008, at Laredo, Texas, and has not been given permission to return.

Rosas-Herrera now moves to suppress all information garnered by law enforcement that revealed his true identity

---

[3] See Miranda v. Arizona, 384 U.S. 436 (1966).

(e.g., his name and fingerprints) on the ground that the information was obtained in violation of the Fourth Amendment to the United States Constitution.

**II. ANALYSIS**

Rosas-Herrera argues that his arrest was unlawful and under United States v. Oscar-Torres, 507 F.3d 224 (4th Cir. 2007), law enforcement's subsequent collection of information about his true identity must be suppressed. More specifically, he contends that he was stopped by Detective Carter without any reasonable, articulable suspicion of any traffic law violation, noting that no charge of reckless driving was ever assessed against him. He also contends that his flight from the scene was permissible insofar as, he contends, his initial stop was unlawful, and he argues that there was no basis for the charge of carrying a concealed weapon because the firearm was seized in violation of Arizona v. Gant, 556 U.S. 332, 129 S. Ct. 1710 (2009). The Government contends that Rosas-Herrera was lawfully questioned and arrested and that, nevertheless, officers collected his identification information solely as an administrative matter during "routine booking" and at no time was his arrest motivated in any way by an investigative purpose.

In Oscar-Torres, law enforcement officers stationed themselves at the entrance of an apartment complex where they were targeting street gang members illegally present in the

United States. Every vehicle that entered or left the complex was stopped and its occupants questioned. Eventually, Oscar-Torres was stopped in this fashion. In response to officers' questions, he admitted to being an illegal alien and, at their request, lifted his shirt to display a tattoo the officers believed signified gang membership. Without any warrant, the officers arrested Oscar-Torres and transported him to ICE headquarters where he was fingerprinted, photographed, and interrogated. Some seven hours after his arrest, he was given his Miranda warnings. Oscar-Torres moved to suppress a fingerprint exemplar obtained from him as well as any records obtained as a result. The Government conceded that Oscar-Torres had been stopped "without 'reasonable, particularized suspicion of illegal activity,' let alone probable cause," but argued that identification information could never be suppressed. Oscar-Torres, 507 F.3d at 227. The district court denied the motion, but on appeal the Fourth Circuit reversed.

The Fourth Circuit stated that "[w]hen police officers use an illegal arrest as an investigatory device in a criminal case 'for the purpose of obtaining fingerprints without a warrant or probable cause,' then the fingerprints are inadmissible under the exclusionary rule as 'fruit of the illegal detention.'" Id. at 230-31 (quoting United States v. Olivares-Rangel, 458 F.3d 1104, 1114-16 (10th Cir. 2006)). The court went on to note

7

that "when fingerprints are 'administratively taken . . . for the purpose of simply ascertaining . . . the identity' or immigration status of the person arrested, they are 'sufficiently unrelated to the unlawful arrest that they are not suppressible.'" Id. (alterations in original) (quoting Olivares-Rangel, 458 F.3d at 1112-13). The court concluded, therefore, that "fingerprints do not constitute suppressible fruit of an unlawful arrest or detention unless the unlawful arrest 'was purposefully exploited in order to develop critical evidence of criminal conduct to be used against [the d]efendant' in a criminal proceeding". Id. (alteration in original) (quoting Olivares-Rangel, 458 F.3d at 1113). The Fourth Circuit remanded the case for further determination by the district court whether, in obtaining the fingerprints and attendant records, law enforcement officers were motivated by an investigative purpose (in which case the information would be suppressed) or an administrative purpose (in which case the evidence could be admitted). The court noted that if "both investigative and administrative purposes motivated the illegal arrest and fingerprinting," then "the fingerprint and attendant record evidence must be suppressed." Id. at 232. Rosas-Herrera concedes that Oscar-Torres does not apply if his arrest was lawful.

8

The Government contends that Rosas-Herrera was lawfully arrested.[4]  It acknowledges that the Fourth Amendment requires an officer to have a reasonable, articulable suspicion that criminal activity is afoot before conducting an investigatory stop.  See Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)).  The Government contends that Detective Carter had a reasonable, articulable suspicion that a traffic violation was occurring because Rosas-Herrera was driving a motor vehicle on a public highway with the windshield "completely iced over" except for a small 3" x 4" hole.  Based on Detective Carter's observation (which was not disputed), it appeared to him that Rosas-Herrera could not adequately see approaching traffic from either the vehicle's right or left

---

[4] The Government argues also that Detective Carter did not in fact stop Rosas-Herrera's vehicle, but rather that Rosas-Herrera voluntarily pulled off the roadway and had already come to a complete stop. However, shortly after Rosas-Herrera stopped his vehicle, Detective Carter pulled his patrol vehicle behind Rosas-Herrera's so as to block it in.  Even though Detective Carter may have activated his blue lights because his vehicle was protruding into traffic "about halfway in the lane," under these circumstances Rosas-Herrera would not have felt free to leave. See United States v. Stanfield, 906 F. Supp. 300, 302-03 (D. Md. 1995) (explaining that where police officers blocked a defendant's car and approached the vehicle from both sides, no reasonable person in the defendant's position "would have felt free to leave" and, thus, the defendant was seized), aff'd, 109 F.3d 976 (4th Cir. 1997); see also Brendlin v. California, 551 U.S. 249, 255 (2007) ("The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver . . . ."); United States v. Duty, 204 Fed. App'x 236, 239 (4th Cir. 2006) (unpublished opinion) ("[Officer] Winston seized [defendant] Duty for purposes of the Fourth Amendment when she activated the emergency lights on top of her car and pulled behind the parked car in which Duty was sitting.  Through this action, Winston displayed an unmistakable show of authority that would give a reasonable person the impression that he was not free to leave.").

9

side.  The Government contends that under these circumstances, Detective Carter had a reasonable, articulable suspicion that the driver was driving recklessly in violation of N.C. Gen. Stat. § 20-140(b) (2009) (prohibiting driving "without due caution and circumspection and at a speed or in a manner so as to endanger . . . any person or property").[5]  Rosas-Herrera contends that because he was driving only ten miles an hour and in fact did not cause any accident, he could not be said to have been reckless or careless.  He also contends that the fact that he was never charged with reckless driving indicates that the stop was pretextual and unlawful.

The court finds that the objective evidence supports a reasonable, articulable suspicion that Rosas-Herrera was operating his vehicle recklessly under the circumstances by attempting to drive on the roadway without adequate vision through his windshield.  See United States v. Anderson, 125 F.3d 849, at *1 (4th Cir. 1997) (unpublished table decision) (holding

---

[5] Section 20-140 provides in relevant part:

- (a) Any person who drives any vehicle upon a highway or any public vehicular area carelessly and heedlessly in willful or wanton disregard of the rights or safety of others shall be guilty of reckless driving.
- (b) Any person who drives any vehicle upon a highway or any public vehicular area without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property shall be guilty of reckless driving.

* * *

N.C. Gen. Stat. § 20-140 (2009).

that the reckless operation of a motor vehicle could supply reasonable suspicion for a traffic stop);[6] State v. Mitchell, 358 N.C. 63, 69, 592 S.E.2d 543, 547 (2004) (explaining that a suspect's failure to stop at a traffic checkpoint gave police officers "reasonable articulable suspicion" that the suspect violated North Carolina's reckless driving statute, section 20-140(a)). At a minimum, Detective Carter was authorized to investigate the situation in order to consider issuing a warning ticket pursuant to N.C. Gen. Stat. § 20-183(b) (2009), which authorizes the issuance of a warning ticket to a motorist "for conduct constituting a potential hazard to the motoring public which does not amount to a definite, clear-cut, substantial violation of the motor vehicle laws." Based on the events that transpired after the stop, however, whether to issue a warning ticket became a moot point.[7]

Rosas-Herrera next argues that he was free to flee the scene because, he contends, his detention was unlawful. Because Detective Carter was authorized to detain Rosas-Herrera, however, this argument fails.

---

[6] Unpublished opinions of the Fourth Circuit are not precedential and are cited as persuasive but not controlling authority.

[7] Rosas-Herrera's contention that the ACSO's failure to charge him with reckless driving demonstrates that the stop was pretextual is without merit. See, e.g., Hines v. State, 448 S.E.2d 226, 228 (Ga. Ct. App. 1994) (explaining that a defendant need not be charged with a traffic violation for a stop pursuant to that traffic violation to be valid).

Under North Carolina law, "[i]f any person shall willfully and unlawfully resist, delay or obstruct a public officer in discharging or attempting to discharge a duty of his office, he shall be guilty of a Class 2 misdemeanor." N.C. Gen. Stat. § 14-223 (2009). The North Carolina Supreme Court, however, has held that "every person has the right to resist an unlawful arrest." State v. Mobley, 240 N.C. 476, 478, 83 S.E.2d 100, 102 (1954) ("In such case the person attempting the arrest stands in the position of a wrongdoer and may be resisted by the use of force, as in self-defense."). This is because where a person has committed no offense, an officer has no authority to arrest; consequently, the person cannot be convicted of resisting arrest. See State v. Allen, 14 N.C. App. 485, 492, 188 S.E.2d 568, 573 (1972).

Despite an individual's freedom to physically challenge an unlawful arrest, resistance is circumscribed in many instances. In the context of investigatory stops, as long as the investigatory stop is permitted by the Fourth Amendment, an individual has no right to resist. Keziah v. Bostic, 452 F. Supp. 912 (W.D.N.C. 1978) (denying petitioner's habeas petition and upholding an arrest for assaulting an officer);[8] State v.

---

[8] In Keziah, a highway patrolman observed the defendant pull off of a public road onto a private driveway at 3:00 a.m. Despite having no reason to believe that the driver had violated or was about to violate any law, the patrolman pulled his vehicle behind the driver's car and demanded that the driver display his license. The driver refused to

12

Swift, 105 N.C. App. 550, 554-55, 414 S.E.2d 65, 68 (1992) (holding that an individual violated section 14-233 where the arresting officers had reasonable suspicion that criminal activity was afoot). This is true even where a stop is predicated on a mistaken identification. See State v. Lynch, 94 N.C. App. 330, 333-34, 380 S.E.2d 397, 399 (1989). Moreover, where a defendant flees from a lawful investigatory stop, the flight could "provide probable cause to arrest an individual for violation of G.S. 14-223." Lynch, 94 N.C. App. at 333-34, 380 S.E.2d at 399; see also State v. McNeill, 54 N.C. App. 454, 456, 283 S.E.2d 565, 567 (1981) (holding that where an officer has a right to detain an individual for questioning and the individual subsequently flees, an officer has probable cause to arrest the individual for obstructing an investigation).

---

do so, and the patrolman arrested him. A scuffle ensued, and the driver was charged with assaulting an officer. The court held that the patrolman's actions in blocking the driver's car were illegal under the Fourth Amendment. Keziah, 452 F. Supp. at 915. Nevertheless, the court held that at least on the facts before it, "there is little difference between the offense under § 14-33(b)(4) [assaulting an officer] and the separate offense of resisting arrest." Id. It also held that the patrolman, who was acting under a North Carolina statute that permitted police officers to stop any vehicle for a license check, had reason to believe the driver's vehicle had been operated on a public road and, thus, that the arrest (presumably for the driver's failure to display a license) was "arguably lawful." Id. at 916. According to the court, "while [the driver] would have had a meritorious defense to any prosecution based on failure to display his license, he was not entitled to invoke self-help against what was, at the time, an arguably lawful arrest." Id. Thus, the conviction for assaulting an officer could survive despite the illegality of the initial stop and demand. Id.

Here, Detective Carter had at least reasonable, articulable suspicion that Rosas-Herrera was engaged in a traffic violation sufficient to detain him. In addition, when Rosas-Herrera fled after Detective Carter's direction to return to his vehicle, Rosas-Herrera was willfully and unlawfully resisting, delaying, and obstructing a public officer in discharging or attempting to discharge a duty of his office, in violation of N.C. Gen. Stat. § 14-223 (2009).

Finally, Rosas-Herrera contends that the firearm that served as a basis for his arrest for carrying a concealed weapon was seized in violation of the Fourth Amendment. Specifically, he analogizes his case to Arizona v. Gant and argues that even if the previous grounds for his arrest were valid, his arrest based on the concealed firearm was invalid and therefore renders Oscar-Torres applicable to his situation.

In Arizona v. Gant, the Supreme Court held that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." Id. at ___, 129 S. Ct. at 1723. Otherwise, in the absence of any other recognized exception to the warrant requirement, the police must obtain a warrant. Id. Rosas-Herrera argues that he was secured in an ACSO vehicle at the time his vehicle was

14

searched and thus neither was he within reach of the passenger compartment of his vehicle nor was it reasonable to believe it contained evidence of the offense of his arrest. This much is true. However, a canine sniff does not constitute a search within the meaning of the Fourth Amendment. United States v. Place, 462 U.S. 696, 706-07 (1983). Further, as Rosas-Herrera conceded at oral argument, the alert of a drug-sniffing canine is recognized as providing probable cause to search an automobile. See United States v. Mason, 628 F.3d 123, 130 (4th Cir. 2010) (explaining that a trained drug-detecting canine's alert creates probable cause to search a vehicle); see also United States v. Branch, 537 F.3d 328, 335-36 (4th Cir. 2008) (holding that police may order a canine sniff of a vehicle as part of a routine traffic stop provided that it does not unreasonably delay the length of a stop (citing Illinois v. Caballes, 543 U.S. 405, 408-09 (2005))), cert. denied, 129 S. Ct. 943 (2009).

The court finds that the ACSO deputies properly engaged the drug canine while processing the scene and that the canine provided probable cause to search Rosas-Herrera's vehicle. See United States v. Claude X, 648 F.3d 599, 602-03 (8th Cir. 2011) (upholding the district court's denial of a motion to suppress where a drug canine's alert gave rise to probable cause to search a defendant's vehicle, even where its occupants had

15

already been arrested); United States v. Howard, 621 F.3d 433, 454 (6th Cir. 2010) (upholding the denial of a motion to suppress where a drug-detecting canine's alert created probable cause to search a vehicle even though the suspect was unlawfully placed under arrest at the time of the search), cert. denied, 131 S. Ct. 1623 (2011). Because the canine's alert created probable cause to search Rosas-Herrera's vehicle quite apart from Rosas-Herrera's arrest, Arizona v. Gant's restrictions on searches incident to arrest are inapplicable. United States v. Webster, 625 F.3d 439, 445 (8th Cir. 2010) ("[T]he warrantless search [of a vehicle] was justified under the automobile exception, irrespective of the applicability of the search incident to arrest exception."). "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." Pennsylvania v. Labron, 518 U.S. 938, 940 (1996); see also United States v. Kelly, 592 F.3d 586, 592 (4th Cir.) (upholding a search under the automobile exception, even though the suspect was handcuffed at the time of the search, because a drug canine's alert created probable cause to believe that drugs were in the suspect's vehicle), cert. denied, 130 S. Ct. 3374 (2010).

Moreover, even if the firearm were to be suppressed based on the foregoing, the court finds that there is an independent

basis for finding that Rosas-Herrera's arrest was lawful (i.e., his traffic violation and obstructing the investigation by flight). Therefore, Oscar-Torres does not apply, and the court need not discern whether law enforcement was motivated by an investigative purpose when it collected Rosas-Herrera's true name, fingerprints, and resulting ICE file.[9]

## III. CONCLUSION

For the reasons set forth above,

IT IS THEREFORE ORDERED that Defendant Teodoro Rosa-Herrera's Motion to Suppress (Doc. 10) is DENIED.

                                                /s/ Thomas D. Schroeder
                                                United States District Judge

October 7, 2011

---

[9] Alternatively, the court finds that even if Rosas-Herrera's arrest were deemed unlawful, it was not purposefully exploited in order to develop critical evidence of criminal conduct against him in a criminal proceeding. Detective Carter did not know the nationality or race of the driver before he approached Rosas-Herrera after the latter pulled his vehicle off the road. The court finds that ACSO deputies obtained Rosas-Herrera's fingerprints, true name, and other identifying information solely as an administrative matter because they were interested at the time in simply ascertaining his true identity and immigration status after his arrest. Deputy Randleman testified that he was designated at the Alamance County jail as the "287G" deputy charged with collecting information in Government Exhibit 2 from all defendants who identified themselves as foreign born. Here, Rosas-Herrera clearly indicated that he was born in Mexico, and the evidence indicates that the ACSO's use of Government Exhibit 2 was part of its routine booking procedure. In addition, he was subjected to the usual booking questionnaire as all other foreign-born defendants. Oscar-Torres, 507 F.3d at 231 ("[W]hen fingerprints are administratively taken for the purpose of simply ascertaining the identity or immigration status of the person arrested, they are sufficiently unrelated to the unlawful arrest that they are not suppressible." (quoting Olivares-Rangel, 458 F.3d at 1112-13) (internal alternations and quotation marks omitted)).